Roseveldt H. Davis v. The Mayor, Recorder, and Aldermen of the City of Jackson.

*Negligence—Duty of city in regard to streets, and its statutory liability, discussed—Proof of oral instructions to street commissioner at open session of council inadmissible—Municipal corporation may ratify unauthorized acts and contracts of its agents and officers—If it might legally have authorized them in first instance—Except where mode of contracting operates as a limitation upon power to contract.*

1. Upon the testimony in this case (see opinion, and particularly pages 534-5), it was error for the circuit judge to refuse to give defendant's fourth, seventh, and ninth requests to the jury. (See opinion, pp. 535-6, for requests.)

2. Where the charter of a city required the board of public works to keep a *record* of its proceedings, evidence of *oral* instructions in open session to the street commissioner, regarding the construction of a drain claimed by the plaintiff to have been improperly built, and which were not recorded, is inadmissible.

3. A municipal corporation may *ratify* the unauthorized acts and contracts of its agents and officers which the corporation might legally have authorized in the *first* instance, subject to exception where the mode of contracting operates as a limitation upon the power to contract.

Error to Jackson. (Gridley, J.) Argued May 11 and 12, 1886. Decided June 10, 1886.

Case. Defendant brings error. Reversed. The facts are stated in the opinion.

*Erastus Peck* (*Eugene Pringle*, of counsel), for appellant.

*Gibson & Parkinson*, for plaintiff.

Champlin, J. This action is brought to recover damages for injuries received by plaintiff, caused by being thrown

from his carriage through the alleged negligence of defendant in not keeping what is known as " Mason street," in the city of Jackson, in repair, and reasonably safe and fit for travel.

Mason street, in the city of Jackson, runs east and west, passing on the north side of a park called "Greenwood Park." On the west side of the park is a narrow street or way used for public travel, which terminates in Mason street at the north-west corner of the park.

The common council of the city of Jackson made an appropriation for the repair of Mason street, between Blackstone and Jackson streets, which includes the place in the street where the accident to plaintiff occurred. The repairs were made, and consisted of graveling the center of the street a space of about eighteen feet for public travel, the cleansing of the gutters, and putting a box drain in the gutter at the intersection of the street on the west side of the park with Mason street, for the purpose of permitting the water which might accumulate in the south gutter of Mason street to pass off. These repairs were made under the direction of the street commissioner, and the expense thereof was audited by the common council, and paid from the appropriation therefor.

This box drain was thirty-seven feet and three inches in length, twelve inches in width, and ten inches in depth, and was so placed that the west end was on a line with the west line of the narrow street referred to above, and extended eastward of the east line of said street a distance of fifteen feet. It was covered with earth so as to be level with the street. Close to each end of the box drain, and on the side of the traveled part of Mason street, a stone was placed for the purpose of keeping people from running off the ends of the drain into the gutter, and to protect the traveling public, and to keep them from running off the end, and were placed there by the direction of the street commissioner as a part of the repairs then made upon Mason street. The cost of placing the stones was embraced in the expense of making the repairs. The stone placed at the east end of the drain was

oblong in form, being about twenty-two inches in greatest length, and about fourteen inches in depth. It was larger at one end than the other, and the heavier end was partially imbedded in the ground, and the other projected about six inches above the level of the top of the drain. The roadway between the stones was in good condition, and safe, and fit for travel, as was also Mason street between the stones and the north gutter.

Between seven and eight o'clock in the evening of November 19, 1882, the plaintiff, riding in a buggy with the top half down, drove northward along the narrow way upon a trot, and turned east into Mason street, where his carriage wheels on the right hand side collided with the stone mentioned, and he was thrown out and injured. It is for this injury that he claims damages, and a right to recover, for the reason that the defendant " wrongfully, knowingly, and negligently suffered said Mason street, near its intersection with said first-mentioned street, to be and remain incumbered with a certain large stone, within or very near to the usually traveled portion of Mason street, and in dangerous proximity thereto, of which the defendant had due notice."

This action is based upon sections 1442 and 1443 of Howell's Statutes, which provide that any person sustaining bodily injury upon any of the public highways or streets in this State, or if any horse or vehicle shall receive any injury or damage, by reason of neglect to keep such public highway or street, etc., in repair, and in a condition reasonably safe and fit for travel, the city whose corporate authority extends over such public street, etc., and whose duty it is to keep the same in good repair, shall be liable to, and shall pay to, the person injured just damages. There is a proviso contained in section 1443 which reads:

" *Provided*, that in all actions brought under this act it must be shown that such township, village, city, or corporation has had reasonable time and opportunity, after such highway, street, cross-walk, or culvert became unsafe or unfit for travel, to put the same in proper condition for use, and has not used reasonable diligence therein."

Section 1445 enacts:

"It is hereby made the duty of the township, villages, cities, or corporations to keep in good repair, so that they shall be safe and convenient for public travel at all times, all public highways, streets, bridges, cross-walks, and culverts that are within their jurisdiction and under their care and control, and which are open to public travel."

Outside of the duty prescribed by this section, there is neither duty nor liability upon a city for negligence in keeping its streets in repair, or safe and convenient for public travel.

The charter of the city of Jackson, in force at the time of the accident, placed the control and jurisdiction of its streets in the common council, and gave the council power to cause the streets to be graded and graveled, and otherwise improved and repaired, and for that purpose to divide the city into street districts, and to provide means to make such repairs and improvements.

The board of public works of the city of Jackson was authorized by an amendment of the charter, in 1871, and as organized under that act has since been continued in force. They were given control of the water-works, sewers, the diking of Grand river, and such other matters relating to repairs and improvement of streets as the common council should, from time to time, by ordinance or otherwise, direct. They were required to keep a record of their proceedings, which should at all reasonable times be open to the inspection of the members of the common council, and all other persons interested.

By an amendment of the charter, passed in 1877, a majority of the board was required to constitute a quorum for the transaction of business, but a majority of all the members thereof was necessary to decide questions before the board; and it required that the record of the proceedings of the board should show the vote of each member upon any question, appropriating money, allowing claims, making or approving contracts, or incurring expenditure, in any manner, and whether he voted for or against such question. By the act of 1877 it was also provided that the board of public works should cause to be performed all such labor, repairs, and

improvements upon the highways, streets, etc., as the common council shall direct.

By a further amendment in 1879, the board was given power to nominate a street commissioner and city engineer, subject to the approval of the common council ; and the board of public works was required to make a report to the common council in writing, on oath of the person having charge of the work that has been performed, giving an exact statement of all labor performed by them, or under their supervision, and the charges therefor, and the street or place where such material was used or labor performed, showing the items and purpose of all expenses incurred since their last preceding report; and it was enacted "that no payment for labor or services performed, or for expenses incurred, by them shall be made until reported on oath, as aforesaid."

With these provisions of the charter before us, we proceed to examine the claim made by the defendant—

"That the stone against which the plaintiff drove was part of the construction of the box drain, placed at its end to protect the traveling public, and to prevent the people from driving off the end into the ditch, as a railing would be placed at the end of a bridge to prevent them from driving off into the river ; that this mode of construction was the city's plan of making the improvement ; and that the city cannot be held liable by reason of any accident or injury occasioned by a defect of such plan."

The evidence introduced in the case upon which this claim is based consists of the following :

1. On March 12, 1882, the committee on ways and means of the common council reported to the council the estimated expenses for the next fiscal year, which, under the head of street work in the several wards, contained the following item : "Fourth ward, for Mason street, east of Blackstone street, $75."

2. In June, 1882, the common council passed the annual appropriation bill for that year, which contained the following item : "For Mason street, between Blackstone and Jackson streets, $75."

3. The appropriation having been made for the improvement of the street, the board of public works proceeded to

make the improvement under the superintendence of the street commissioner. A part of this improvement consisted in the construction of the box drain and the placing of the stone under the direction of the street commissioner. This was done August 1, 1882.

4. On August 7, 1882, the street commissioner presented to the board his sworn report and pay-roll for the cost of the construction of the box drain, including the placing of the stone at its end.

5. Upon the pay-roll being reported to the board, it was referred to the committee on streets, who reported it correct, and recommended that it be audited against the Fourth ward fund. The report was accepted, the account audited as recommended, and ordered transmitted to the common council.

6. At its session the same evening this pay-roll was received by the common council, and considered by it in the committee of the whole, who reported a resolution for its allowance, which was duly adopted by the common council.

7. This resolution was certified by the recorder to the mayor, and it was afterwards approved by the mayor.

Under this testimony the defendant's counsel claims that he was entitled to his fourth, fifth, sixth, seventh, eighth, ninth, tenth, and eleventh requests to charge, which were as follows:

" *Fourth.* If you find that the placing of the stone in question at or near to the end of the box drain by the defendant was a part of the plan for improving the street by putting in the drain, and protecting the end of the drain and the traveling public from injury or accident by placing the stone in the position where it was at the time of the accident, the plaintiff cannot recover.

" *Fifth.* It is not necessary that the plan by which the city makes its improvements shall be written out or formally adopted by the common council, or board of public works, or any city authority, if it shall appear by the completed work that it was performed upon some plan.

" *Sixth.* An improvement made under the superintendence of an officer of the city must be presumed to have been done in accordance with a plan adopted by the city.

" *Seventh.* When a street has been improved by the construction therein of a box drain or culvert, one end of which is protected by a stone placed there at the time of its construction, and as a part thereof; and the pay-roll prepared

by the officers in charge of the work for the labor and material has been subsequently audited by the board of public works, allowed by the common council of the city, and approved by the mayor,—this corporate action must be considered equivalent to the adoption of the plan by which the improvement was made.

"*Eighth.* When the proper city authorities make an improvement, and said improvement is completed according to the judgment of the city authorities, the plan upon which the same is made is the city's plan, and there can be no liability unless it shall subsequently suffer the same to get out of repair, and to remain so after notice of the defect.

"*Ninth.* The wrong which must exist, to render the city liable, is neglect, and there can be no neglect when the work was completed as intended. Negligence cannot be predicated on a work done in accordance with its design or plan, even though it does not sufficiently protect the public.

"*Tenth.* In planning or designing a public work the city must determine for itself to what extent it will guard against possible accidents; and courts and juries are not to say it shall be punished in damages for not giving the public more complete protection, for that would be to take the administration of municipal affairs entirely out of the hands to which it has been intrusted by law.

"*Eleventh.* The city is protected the same, whether its design or plan of a public work is written or unwritten; expressed before the commencement of the work by formal resolutions, or after its completion by adopting it; or by paying for it, and allowing it to remain; or by any other form of expressing its approval of or satisfaction with it; nor does it make any difference whether the work is a small or extensive one."

These requests were refused, and the learned judge remarked to the jury upon this subject as follows:

"The next question, and one which was of more gravity than all the rest, perhaps, was as to what protection it would afford to the city if this work had been done under the legislative action of the public authorities; and while the court did not feel entirely certain about this question, I thought it advisable and best to rule, for the purpose of a trial of this cause, that it was not such a thing—what was done was not such a thing—as would be protected by any action taken by the common council in that regard; and that if it could be so protected, that there was not sufficient evi-

dence to show that this action had been taken by the council in a proper and legitimate way, so as to afford this protection to the city."

The defendant failed to introduce any evidence from the record of the proceedings of the common council that they had, previous to the work being done, adopted any plan for the improvement or repair of Mason street, between Blackstone and Jackson streets, for which the appropriation was voted. The report of the committee of ways and means did not contain it.

It is not claimed that the common council ever gave any directions to the board of public works to repair or improve Mason street in any particular manner, or even at all. The appropriation was for street work, required to be raised and expended in different wards, and for the Fourth ward was, among other streets, the following: "Fourth ward, for Mason street, east of Blackstone, $75." Neither was there any record evidence offered to show that the board of public works had adopted a plan under which the repairs were made, or that they directed the repairs to be made in accordance with any plan. The circuit judge, therefore, considered that the case was barren of any evidence which would justify him in giving the instructions asked.

When streets are improved by being graded, their grade lines established, gutters, curbing, sidewalks, and crosswalks constructed, involving a considerable outlay and special assessments to defray the expense, it is reasonable to suppose that plans and specifications will be made and adopted as a basis for the proposed improvement. But when repairs are made upon a street which has been previously graded and improved, to put it in a condition fit for travel by simply mending it, adding gravel in the center of the street, cleaning out the gutters, and repairing or providing suitable drains in the gutters at intersecting streets, it is not reasonable to suppose that detailed plans and specifications will be adopted for such repairs.

Such seems to have been the case with regard to Mason street. It had been previously graded and improved,—but

whether graveled or not does not appear,—and an appropria-
tion had been made to be expended in repairs.   Some gravel
was placed in the middle of the street to repair or improve the
traveled portion, the gutters were cleaned out, and a drain
placed in the south gutter to carry the water off.   This was
done under the immediate supervision of the street commis-
sioner.   When an appropriation had been made for that pur-
pose we should hardly expect to find a detailed plan of such
repairs made in advance, or even a formal resolution entered
upon the minutes of either the council or board of public
works; and if we did not, and the repairs were made, and
the expense reported, and the bills therefor approved and
paid by the department that had the authority to direct them
to be done in the first instance, we think it would have the
effect to approve the work as done, and be such an adoption
of the plan as would render the corporation liable if the
work had been executed in an improper manner; and such
action of the corporate authorities having charge of keeping
the streets in repair was such a ratification of the plan upon
which the repairs were made as to be as binding as if pre-
viously ordered to be executed according to the plan adopted
by the street commissioner.

This view is supported by *Lansing v. Toolan*, 37 Mich.
152, where the contractor was employed by the city to build
a wing to one of the bridges over Grand river, and, in the
prosecution of that work, he found it necessary to cut a
ditch across a street near it, to keep the water after a heavy
rain-fall from rushing against and destroying his unfinished
wall.   This he did upon his own responsibility, covering it
with plank to the width of 16 feet.   While in this condition
Toolan, when turning off the street when passing along in
the evening, fell in the ditch, and was injured.   The city
afterwards paid the contractor for his work, and allowed the
ditch to remain for a sewer.   Toolan claimed that the city
had accepted and ratified the act of cutting the ditch and par-
tially covering it, and was therefore liable, under the princi-
ples laid down in *Detroit v. Corey*, 9 Mich. 165.   But the
Court held that the case was governed by that of *Detroit v.*

*Beckman*, 34 Mich. 125, to the effect that the lawful exercise of legislative action cannot be a wrong; and as the determination of the plan of a public work is in the nature of legislative action, there must be something besides the proper execution of the plan—some negligence in its execution, or some other distinct wrong—before the municipality constructing the work could be held responsible as for a tort. And the Court, treating the action of the counsel in paying the contractor, and adopting the ditch for a sewer, as a ratification of the plan upon which it was constructed, held the city was not liable.

We think the defendant's counsel was entitled to have the fourth, seventh, and ninth requests given to the jury under the testimony in the case. The others either contained general propositions or were inapplicable to the case, and were rightly refused.

Defendant offered to prove that the board of public works orally, in open session, ordered the street commissioner to construct the drain and place the stones as it was done, which offer the court ruled out. This ruling was correct. The statute required the board to keep a record of their proceedings. The offer was not to show that a resolution or vote was formally passed, which, by some misprision of the clerk, had failed to get upon the record, but that he was directed in open session verbally, by some person not identified, to perform the work. To allow this would open the door to the grossest abuses. We see no occasion for it in this instance.

In *Chilson v. Wilson*, 38 Mich. 267, verbal evidence was admitted, against objection, of a resolution of council, and of certain other proceedings; but the error was in favor of the losing party, and he could not complain.

This case is also relied upon by counsel for plaintiff as deciding that the repair of the street, according to a plan adopted by the street commissioner, could not be delegated by the council, and consequently his act was unauthorized, and afforded no protection to the officer or city. But the case does not go to that extent. The action there was tres-

pass against the officer for digging a ditch upon plaintiff's premises. The defendant pleaded in justification that the street was public, and that his acts were done under the authority, and under the directions, of the village council. On the trial defendant failed to prove that the council ever directed or ratified the act. He merely showed that he acted under the discretionary orders of the committee on streets, which could not be held equivalent to directions by the council.

The doctrine is well established that a municipal corporation may ratify the unauthorized acts and contracts of its agents or officers, when the corporation might legally have authorized such acts and contracts in the first instance (1 Dill. Mun. Corp. § 463, and notes), subject to exception where the mode of contracting operates as a limitation upon the power to contract.

The judgment of the circuit court must be reversed, and a new trial had.

The other Justices concurred.